# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Smith*, 2012 IL App (2d) 110522

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF SHARYL L. SMITH, Petitioner-Appellee and Cross-Appellant, and LLOYD A. SMITH, Respondent-Appellant and Cross-Appellee. |
| District & No. | Second District<br>Docket No. 2-11-0522 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | October 24, 2012<br><br>December 18, 2012<br>December 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a judgment in the dissolution of a marriage, the grant of maintenance of $200 per month for two years to respondent was not an abuse of discretion, but the court did abuse its discretion in requiring petitioner to pay 20% of her net income for child support when the parties shared custody and it did not apportion the statutory guideline amount or apply the statutory factors, and in dividing petitioner's 401(k) equally without considering the statutory factors and then dividing the property in just proportions. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 08-DV-1193; the Hon. Michael J. Chmiel, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Robert E. Burke, of McHenry, for appellant.

Jenette M. Schwemler, of Law Office of Jenette M. Schwemler, P.C., of
Crystal Lake, for appellee.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice Schostok concurred in the judgment
and opinion.

## OPINION

¶ 1     Respondent, Lloyd A. Smith, appeals from an order of the trial court granting petitioner Sharyl L. Smith's petition for dissolution of marriage. On appeal, Lloyd contends that the trial court erred in granting him maintenance of only $200 per month for two years. On cross-appeal, Sharyl argues that the trial court erred in: (1) granting Lloyd child support equal to 20% of her net income, when the parties shared custody of their minor child; and (2) in response to Lloyd's posttrial motion for reconsideration, distributing her 401(k) equally between the parties, without first reevaluating the parties' property distribution. For the following reasons, we affirm the trial court's order granting Lloyd maintenance in the amount of $200 per month for two years. However, we reverse the trial court's orders awarding Lloyd child support equal to 20% of Sharyl's income and dividing Sharyl's 401(k) equally between the parties. Finally, we remand this cause for further proceedings consistent with this opinion.

¶ 2                             I. FACTS

¶ 3     The record reflects that the parties married on August 2, 1982. Three children were born to the marriage, but at the time of trial, only one child was a minor, 12-year-old Alyssa. Sharyl filed a petition for dissolution of marriage on December 19, 2008. On December 2, 2009, the parties entered into a joint parenting order, which designated neither party as the primary residential parent and allowed each party visitation on alternating weekends and half the week days.

¶ 4     On April 9, 2010, Sharyl's counsel submitted to the trial court a "joint trial memorandum," which outlined the contested and noncontested issues for trial. In that memorandum, the parties stipulated that Lloyd was "disabled and receiving Social Security benefits." The memorandum did not indicate whether Lloyd's disability was temporary or permanent. The memorandum was not signed by the parties or their counsel.

¶ 5     In opening statements at trial, Sharyl's counsel represented that Sharyl had stipulated that Lloyd was currently disabled. Sharyl testified that she was 47 years old, she had a high school education, and she had attended two years of technical school at the SwedishAmerican Hospital in Rockford. She received a certification in radiology and was

currently employed as a registered computerized tomography (CT) technologist at Centegra Hospital.

¶ 6 Sharyl testified that she suffers from several diseases. She has a medical condition known as idiopathic thrombocytopenia (ITP), which causes her platelets to drop. At the time of trial, Sharyl's platelets were stable, but lower than normal. She said that, if her platelets were to drop to zero, she might have to go through a round of chemotherapy or have her spleen removed. She also has a liver disease, which was triggered by a portal vein thrombosis. Further, she is in the early stages of cirrhosis, but it is not alcohol-related. Sharyl also has diabetes, high blood pressure, and gastroesophageal reflux disease. Finally, she said that she has a hiatal hernia that needs to be fixed, and she has a lap band that needs to be surgically removed because it is causing nausea and vomiting.

¶ 7 According to Sharyl, her liver condition is possibly life-threatening. She might need a liver transplant in the future due to her cirrhosis. She believes that her health is worse than Lloyd's health. She is nauseated on a daily basis and she vomits all the time. She is able to work, but it is very difficult. With regard to medications, she is currently taking Lantus, Novolog, Bystolic, Aciphex, and Reglan. She is an insulin-dependent diabetic and takes insulin after every meal and at nighttime.

¶ 8 Sharyl has worked full time for Centegra for 27½ years. She typically works 80 hours per pay period (every two weeks), with overtime. Her current rate of pay is $37.13 per hour. Beginning on April 1, 2010, however, her employer cut her hours to 72 per pay period. She also said that she is not currently able to get overtime. She has been the primary provider for the family during the entire marriage.

¶ 9 Although she stipulated that Lloyd is currently disabled, Sharyl does not believe that he is permanently disabled. She thinks that he could get a "desk job" where he would be allowed to get up and go to the restroom as needed. He also could work out of the home as a medical coder if he were trained. She said that the last time Lloyd worked was in April 2000. Throughout the marriage Lloyd was employed "off and on." When he was working, he was a warehouseman at Tru Serve and made $12 per hour. Sharyl thinks that the most money Lloyd ever made in one year was around $16,000. She worked overtime so that they could pay the bills.

¶ 10 Sharyl's group exhibit 9, which contained copies of the parties' joint tax returns, was then entered into the record. Their 2007 tax return indicated that Sharyl's gross income for that year was $72,465, and Lloyd received $13,196 from Social Security. In 2008, Sharyl's gross income was $76,030, and Lloyd received $13,817 from Social Security. In 2009, Sharyl's gross income was $74,928; Lloyd received $14,621 from Social Security. In addition, Lloyd receives a Social Security allotment for Alyssa because he is receiving Social Security disability. At the time of trial, Lloyd was receiving $609 per month from Social Security for Alyssa. Sharyl said that Alyssa's Social Security allotment goes into the parties' joint checking account, which she does not use. The money in the joint checking account is for Lloyd's use only and he is supposed to be using the money for Alyssa and himself. Sharyl does not use those funds to pay any of the bills. Sharyl said that her income would be lower in 2010 because her hours were reduced by 10%. In addition to this reduction, her employer

is now sending her home on "low census" days. She sometimes has to use her vacation time to supplement her pay.

¶ 11    Sharyl currently lives in the marital residence in Harvard. It is a ranch house with cedar siding. The siding needs to be stained and part of it needs to be replaced. There are boards pulling away from the house that need to be replaced. Sharyl thought that the parties could partially repair and stain the boards to make the house look decent if it had to go on the market, but she estimated that it would cost at least $500 to $1,000. The house also has windows that leak air, and the carpet is in bad shape. The parties purchased the home in May 1998. Sharyl said that it still has the original roof, which will eventually need to be replaced.

¶ 12    Sharyl testified that she and Lloyd bought the marital house for $115,000 and took out a $107,000 mortgage on it. The original mortgage payment was $950 per month. They currently owe $102,900 on the first mortgage, and $25,000 on a second mortgage. The interest rates are 9.8% on the first mortgage and 12% on the second mortgage. Currently, the payment on the first mortgage is $990, and the payment on the second mortgage is $629.33. Taxes are an additional $300 per month. According to Sharyl, their total mortgage balance increased since 1998 because of the money Lloyd had taken out for gambling. Sharyl said that if the court ordered her to pay $1,000 per month for child support and maintenance she would lose the house.

¶ 13    Sharyl said that in 1998 or 1999 she came home from work one day and noticed a credit card with her name on it that she did not know she had. According to Sharyl, Lloyd "took it out" and had put her name on it. Sharyl said that at one point they had $35,000 in credit card debt and that she had incurred only $1,000 to $2,000 of that amount.

¶ 14    Sharyl had discussed with Lloyd his gambling at the dog track. In response, she said, Lloyd told her that he could go to the dog track anytime he wanted. He went to the dog track at least three to four times a week. In 2006, the parties filed for bankruptcy. According to Sharyl, medical bills, Lloyd's gambling debt, and their credit card debt caused the bankruptcy. Between $40,000 and $50,000 in debt was discharged through the bankruptcy in 2007.

¶ 15    Sharyl testified that she had a 401(k) through her employer. On two occasions, she took loans against her 401(k). In December 1999, she took out $12,427 for a hardship loan that she did not have to pay back. She needed the hardship loan in order to save the house, because the parties were late on their mortgage payment. If she had not gotten the loan, they would have lost the house.

¶ 16    In 2000, Sharyl took out another loan of $15,000 for home improvement, but only $8,000 was used for that purpose. The remainder of the loan money was used to pay a few bills, and the rest was squandered on Lloyd's gambling debts. Sharyl paid back that loan by having $132 withdrawn from each paycheck for five years.

¶ 17    From 1998 until around 2003 Lloyd received $300 a week in temporary disability payments from workers' compensation. Lloyd used a portion of that money to pay the second mortgage and he used the rest as he deemed fit. Sharyl said that Lloyd told her that it was his money and he could do whatever he wanted with it. He used the money for gambling. In

2003, Lloyd received a lump sum of around $12,000 from Social Security. With that money he bought his oldest daughter a car for $5,000. The remainder was spent on gambling at the dog track.

¶ 18    Sharyl said that Lloyd receives $1,109 every month from Social Security, plus Alyssa's $609 per month. Lloyd uses about half that amount to pay household bills, but Sharyl does not know what he does with the remainder of the money. She has asked him for more help financially, but he has refused.

¶ 19    Sharyl identified exhibit 16, which was her financial affidavit, listing all her expenses. She said that she makes a decent amount of money, but she barely has any left over at the end of the month because of all the bills she must pay. She also identified exhibit 22, which was a summary of the parties' joint checking account. She did not write any of the checks listed in the exhibit; some were checks that Lloyd wrote to himself for cash each month, and the amount varied from $200 to $600. Lloyd never told Sharyl what he did with the money, and he never gave her any of the cash to pay household expenses.

¶ 20    Sharyl also identified exhibit 13, which showed her gross pay year-to-date figure of $21,087.04 as of April 3, 2010. When asked whether that figure accurately reflected an annual salary of $82,760.96, Sharyl responded that she disagreed with that computation because it was based upon an 80-hour pay period, and as of April 1, 2010, she was down to a 72-hour pay period. The reduction in work hours would result in an annual salary of about $69,500, with an additional amount in 2010 because she was able to work 80 hours per pay period from January through April 1 of 2010.

¶ 21    Sharyl had $128,000 in her Fidelity retirement account at the time of trial. This was the only investment account that Sharyl owned.

¶ 22    Lloyd testified that he was 50 years old and he had three years of college education. From around 1987 until 2000 he worked as a warehouseman at Tru Serve in Harvard. He earned $12 per hour, which was approximately $20,000 per year. Around April 3, 2000, he was pulling a chimney pot off a pallet onto a cart and his back "went out." As a result of the accident he received a lump sum of $18,000 in Social Security benefits in 2003. When asked what he did with the money, Lloyd said that he bought his oldest daughter a car with some of it, and used the remainder to finish the basement of the marital home.

¶ 23    Lloyd said that he began receiving workers' compensation payments for his injuries in April 2000. About six months before trial, he received a lump-sum workers' compensation settlement of around $114,000. Pursuant to an agreement with Sharyl, each of the parties took $10,000, and the balance of $94,397.51 remained on deposit at First Midwest Bank. Lloyd testified that his net monthly income after federal taxes was $1,471.35 and that $600 of that amount was allotted for Alyssa.

¶ 24    Lloyd testified that he receives Medicare Parts A and B, which provide coverage for hospitals and doctors. He thought he was eligible for Medicare Part D, which would cover prescriptions, but he had not applied for it, because it was too expensive. He did not know the cost of Medicare Part D, but he knew that he would have to spend $4,500 out-of-pocket before any benefits would begin. He spent between $300 and $400 per month on prescriptions.

¶ 25    Lloyd said that from 2000 to 2005 he went to the dog track two to three times per week. He spent about $40 to $60 each time he went to the track. He said that he generally broke even on his bets, but he estimated that he won over $600 on around 20 occasions. However, those winnings were split with a friend.

¶ 26    Lloyd testified about the figures listed in his financial affidavit. Lloyd explained that his $800-a-month grocery bill was high because Alyssa was very picky and liked fast food. According to the figures, Lloyd's monthly expenses exceeded his available income by $4,800. He was requesting permanent maintenance because he will never be able to work again.

¶ 27    Lloyd said that he was planning to use the money he received from the workers' compensation settlement as a down payment on a house that he had picked out. The house was listed at $118,000 and he was going to put in an offer of $100,000 for it. He said that he was willing to go as high as $108,000 to purchase the home. He acknowledged that since there was only $94,000 left in the workers' compensation settlement he would have to get a mortgage to make up the difference for the cost of the house. The utility expenses set forth in his financial affidavit were estimates based upon what he believed he would be spending in his new home, in light of the utility expenses in the marital home. Since his financial affidavit showed a $4,800-a-month deficit and he was going to use all of his workers' compensation settlement to purchase a new house, he would need maintenance from Sharyl to meet his monthly living expenses.

¶ 28    Lloyd then testified about his health and the effect that it had on his ability to provide for himself. He has degenerative disc disease, specifically, a failed fusion at L5/S1, and a bulging disc at L4/L5. That condition causes his left foot to go numb on occasion. He also has lumbar neurogenic bladder, which was caused when nerves were cut during surgery on his back in 2001. As a result, he has to use the restroom around every 30 minutes. He also has high blood pressure, diabetes, gastroesophageal reflex disease (GERD), depression, and asthma. Further, he listed one of his medical conditions as arachnoiditis, although he could not define that condition. According to Lloyd, as a result of these ailments, he is unable to earn a living. He disagrees with Sharyl that he could hold a job. He said that he has been adjudicated disabled by the Social Security Administration, but he did not believe that the Social Security payments he received were sufficient for him to live on. When asked by his counsel what he thought was the purpose of the workers' compensation settlement, Lloyd answered that he believed that the money was to be used to live on for the rest of his life because he can no longer work.

¶ 29    On cross-examination, Lloyd testified that he knew that Sharyl took out two loans against her 401(k) and that she paid bills with the money, but he did not know if she paid off credit card debt with the money. With regard to Sharyl's testimony that she found a credit card in her name that she knew nothing about, Lloyd said that he did not recall that event. He also did not recall Sharyl giving him information on state programs that could potentially cover his prescriptions. He admitted that she had talked to him about the state programs, but he said that she never gave him any information on them.

¶ 30    Lloyd admitted that at the time of trial Sharyl paid almost all the bills with her salary,

except for the cable and the garbage bills. He also admitted that although his financial affidavit listed his monthly expenses as $4,800 in excess of his income, that total was based upon expenses that he would have if he purchased a home. When asked whether he had ever given Sharyl money from his Social Security payments to help pay the household expenses, he said that he was sure he had given Sharyl money but could not remember when or any other details about such transactions.

¶ 31    At the end of trial, the court talked briefly about child support and maintenance, but noted that it would adjourn until May 18, 2010, when, it hoped, it would have a written decision.

¶ 32    On April 30, 2010, Lloyd filed a motion to reopen the proofs. In the motion, he argued that, since Sharyl failed to submit a trial conference memorandum with a complete set of exhibits and "issues to be tried," he was surprised by her attempts to introduce various documents into evidence. On May 17, 2010, Lloyd filed an amended motion requesting that, in response to Sharyl's claims of dissipation, the trial court consider additional exhibits detailing certain expenditures. On May 18, 2010, the trial court denied Lloyd's request to reopen the proofs.

¶ 33    On June 2, 2010, in announcing its judgment, the trial court initially noted that it found both parties to be credible witnesses. It then said that, based upon the testimony, it did not find that Lloyd was completely disabled. In fact, it found credible evidence that Lloyd was *not* permanently disabled, that he could work, and that, with a child to rear at least half the time, he should work.

¶ 34    With regard to Lloyd's workers' compensation settlement, the court ruled that, of the remaining proceeds, $80,000 would go to Lloyd and the balance (around $14,000) would go to Sharyl. As for child support, the court noted that the parties were in a joint parenting situation in that they shared equal time with Alyssa. The court then made the following findings and ruling:

> "The challenge for the court, and this is the way I arrived at the following award on child support, is I have to look at the respective estates and Mrs. Smith is making a lot more money through all earnings, through all income, than Mr. Smith. If I create one estate, divide it in half and try to, what I call, equilibrate, if I can use a scientific term here, I find that Miss Smith should pay to Mr. Smith for [Alyssa] $805 per month."

¶ 35    The court then made its finding with regard to maintenance and ruled as follows:

> "Maintenance is a challenging issue because I did receive credible testimony that Mr. Smith, to put it politely, perhaps because of infirmity, but I don't believe completely that case [*sic*], hasn't really done much to help the family, whereas Miss Smith has carried the laboring oar. Nevertheless, considering that, considering, again, all of these items, especially at this point the workers' comp money, I don't believe that any type of permanent award is due and owing to Mr. Smith. Nevertheless, I will award him $200 per month for the next 24 months to help with some of his needs based upon the length of the marriage, his apparent disability, even though I don't find it to be a permanent disability."

¶ 36    The trial court awarded the marital home, valued at $141,316.50, to Sharyl. However, Sharyl was solely responsible for both mortgages on the home, which totaled around

$127,000.

¶ 37     On June 7, 2010, Lloyd filed a motion to reconsider. On June 15, 2010, the trial court entered its written judgment, which contained the same terms with regard to child support and maintenance that it had announced earlier. On June 22, 2010, Sharyl filed a motion to vacate, modify, or reconsider the June 15, 2010, judgment. Among other contentions, Sharyl complained that the judgment did not follow the child support guidelines set out in the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505 (West 2010)), in that the trial court did not make the required finding as to why it was deviating from the guidelines and did not place the burden on Lloyd to show why such a deviation was necessary. Sharyl also argued that the $805-per-month award was above the guideline of 20% and there was no statute or case law to support the court's decision to combine the parties' respective incomes to determine child support.

¶ 38     On October 4, 2010, the trial court heard arguments on both parties' motions and took the case under advisement. On November 2, 2010, Lloyd filed an amended motion for reconsideration. In the amended motion Lloyd requested that the trial court reconsider its decision as it related to his disability status and the maintenance award. He also noted that in its judgment, the court failed to provide for the disposition of Sharyl's 401(k) account. On November 18, 2010, a hearing was held on Lloyd's amended motion for reconsideration, and on May 23, 2011, the court issued a decision on that motion as well as on Sharyl's motion to vacate, modify, or reconsider.

¶ 39     In its decision, the trial court modified its judgment *nunc pro tunc* June 15, 2010, on issues regarding health insurance, uncovered expenses, child support, and Sharyl's 401(k) account. With regard to child support, the court made the following comment:

    "Next, there is essentially an uncontroverted presentation on the net income for Sharyl Smith, that being the amount of $3,556. If so, it is true that 20 percent of that amount should drop that monthly child support payment from $805 to $711.20, effective as of the first point in time that the payment was made or would have been made payable. In other words, as of the date of judgment."

¶ 40     With regard to Sharyl's 40l(k) the trial court made the following comment:

    "There is an issue with regard to a 401(k). Again, the presentations are not as crisp as they probably should have been. I think a lot of these issues–many of these issues were not fully covered. So, the court essentially dealt with what it received as it received it.

    But nevertheless, with regard to any and all pensions, or of the like, a portion earned during the marriage should be divided half to each side, and I don't see a reason to deviate with the other findings of the court ***."


¶ 41                              II. ANALYSIS
¶ 42                      A. Lloyd's Appeal–Maintenance
¶ 43     On appeal, Lloyd's sole issue is that the trial court erred in granting him only $200 in monthly maintenance for two years. Within this argument, he claims that, since Sharyl had stipulated in the joint trial memorandum that he was disabled, he offered little or no evidence

of his disability and argued only that he required permanent maintenance in an amount sufficient to help him defray his monthly deficit of $4,800, as confirmed by his financial affidavit and his testimony. He contends that, since Sharyl drafted the memorandum and there was no qualifying term such as "not completely" or "not permanently" next to the word "disabled," any ambiguity should be construed against her, as the drafter of the document. Lloyd also maintains that he is entitled to additional maintenance since: (1) he is unable to earn a living due to his disability; (2) Sharyl earns significantly more income; (3) the marriage was long; and (4) the parties had been operating under a standard of living in which Sharyl worked and Lloyd did not work because of his disability.

¶ 44　　Maintenance is designed to be rehabilitative and to allow a dependent spouse to become financially independent. *In re Marriage of Haas*, 215 Ill. App. 3d 959, 964 (1991). " 'Permanent maintenance, on the other hand, is appropriate where it is evident that the recipient spouse is either unemployable or employable only at an income that is substantially lower than the previous standard of living.' " *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 9 (quoting *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 303 (2005)).

¶ 45　　Section 504(a) of the Act (750 ILCS 5/504(a) (West 2010)) provides that a court may grant permanent or temporary maintenance upon consideration of "all relevant factors," including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement between the parties; and

(12) any other factor that the court expressly finds to be just and equitable."

¶ 46　　Courts have wide latitude in considering what factors to use in determining reasonable needs, and the trial court is not limited to the factors listed in the Act. *Brankin*, 2012 IL App

(2d) 110203, ¶ 10. "No one factor is determinative of the issue concerning the propriety of the maintenance award once it has been determined that an award is appropriate." *Murphy*, 359 Ill. App. 3d at 304. The propriety of a maintenance award is within the discretion of the trial court, and the court's decision will not be disturbed absent an abuse of discretion. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3. It is well established that an abuse of discretion will be found only where no reasonable person would take the view adopted by the trial court. *Id.* When a party challenges a trial court's factual findings regarding a maintenance determination, this court will not reverse the findings unless they are against the manifest weight of the evidence. *Id.* Findings are against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 294 (2010).

¶ 47      We initially note that we are not persuaded by Lloyd's argument that, since Sharyl did not put words such as "not completely" or "not permanently" in front of the word "disabled" in the joint trial memorandum, she cannot now argue that Lloyd is not permanently disabled. First, neither the parties nor their counsel signed the memorandum. Second, it is clear from the record that Sharyl never agreed that Lloyd's disability was permanent. During opening statements, Sharyl's counsel noted that the parties had stipulated that Lloyd was *currently* disabled. Therefore, Lloyd cannot claim that it is Sharyl's fault that he "offered little or no evidence of his disability." No later than the opening statements, Lloyd was on notice that Sharyl did not agree with him about the status of his disability. Further, contrary to Lloyd's claims, he offered more than a little testimony regarding his disability. He testified about his various medical conditions, the medications he was taking, and the fact that he has to use the restroom frequently. If Lloyd wanted to further elaborate on his disability, he should have done so at trial.

¶ 48      After a careful review of the record, we agree with the trial court's finding that Lloyd is not permanently disabled. Although he might never be able to return to a manual labor job, it is clear that he is physically capable of being employed in some capacity. By his own testimony he left his house a few days a week for several years to place bets at the dog track. The fact that he could engage in this type of activity indicates that he is physically capable of working outside the home for an employer who would accommodate his frequent need for restroom breaks, or he could attempt to get a job that allowed him to work at home. Lloyd also has three years of college education, which further indicates that he is capable of handling a "desk job." For these reasons, we find that the trial court's finding that Lloyd was not permanently disabled was not against the manifest weight of the evidence.

¶ 49      We next turn to the issue of whether, regardless of his disability status, Lloyd was entitled to an award of permanent maintenance or at least a higher amount than he was given.

¶ 50      We have reviewed all the relevant factors enumerated in the Act and determine that the trial court did not err in setting Lloyd's maintenance award at $200 per month for two years. With regard to the parties' income, the trial court awarded Lloyd the majority of his workers' compensation award ($80,000 of the remaining $94,397.51). In addition to this lump sum, Lloyd received more than $1,400 per month in net income from Social Security for himself and Alyssa. Although Sharyl's income was much greater than Lloyd's, we agree with the trial

-10-

court's finding that, even given his disability, Lloyd had not done much to help his family, whereas Sharyl "carried the laboring oar."

¶ 51 As for the parties' needs, it is clear that if Sharyl wishes to remain in the marital home several home repairs will need to be done. Although Lloyd was not given the marital home, the $80,000 he was given from his workers' compensation award would allow him to rent a house or apartment or to purchase property if he determines that he would be able to do so and still have sufficient income to live on while he looks for employment. We have reviewed Lloyd's financial affidavit and find it of no use, since many of the figures are based upon expenses that he does not currently incur.

¶ 52 Although Sharyl clearly has more present and future earning capacity than Lloyd, she also has much more debt. Also, as we previously indicated, Lloyd could seek employment that does not involve manual labor. We do not find that Lloyd's earning capacity was impaired because the parties decided that he should stay home and care for Alyssa. Instead, his earning capacity was impaired because he chose not to work.

¶ 53 With regard to the standard of living established during the marriage, the parties did not enjoy a high standard of living. In fact, the evidence presented at trial indicated that for at least the past several years Sharyl and Lloyd struggled financially and eventually had to declare bankruptcy to pay Lloyd's medical bills and to discharge credit card debt. As for the parties' age and physical and emotional condition, both Sharyl and Lloyd have several medical issues. Finally, although the marriage was long, that factor alone cannot trump all the other relevant factors we have taken into consideration. For these reasons, the trial court's findings were not against the manifest weight of the evidence, and it did not abuse its discretion in awarding Lloyd $200 per month in maintenance for two years.

¶ 54 B. Sharyl's Cross-Appeal

¶ 55 On cross-appeal, Sharyl argues that the trial court erred in: (1) awarding child support to Lloyd according to the statutory guidelines for a noncustodial parent, when the parties share custody of Alyssa; and (2) distributing her 40l(k) without reevaluating the property distribution.

¶ 56 We initially note that Lloyd did not file a reply brief in this case and therefore he has not responded to the issues that Sharyl raises on cross-appeal. However, the lack of a reply brief does not prevent us from addressing the issues raised, since the record is simple and the claimed errors are such that we can decide them without the assistance of a reply brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 57 1. Child Support

¶ 58 Sharyl first contends that the trial court erred as a matter of law when it awarded child support to Lloyd according to the statutory guidelines for a noncustodial parent, when the parties share custody of Alyssa. Specifically, Sharyl argues that the trial court erred when it failed to apply the law as announced by this district in *In re Marriage of Reppen-Sonneson*,

-11-

299 Ill. App. 3d 691 (1998).

¶ 59    Pursuant to the Act, a *noncustodial* parent should pay 20% of her net monthly income for child support for one child. 750 ILCS 5/505(a)(1) (West 2010). When custody is shared, however, the court may apportion the percentage between the parents or disregard the statutory guidelines and instead consider the factors listed in section 505(a)(2) of the Act. *Reppen-Sonneson*, 299 Ill. App. 3d at 695. The factors enumerated in section 505(a)(2) include: (1) the financial resources of the child; (2) the financial resources and needs of the custodial parent; (3) the standard of living the child would have enjoyed had the marriage not been dissolved; (4) the physical and emotional condition of the child and her educational needs; and (5) the financial resources and needs of the noncustodial parent. 750 ILCS 5/505(a)(2) (West 2010).

¶ 60    Under the Act, if a court deviates from the statutory guidelines, its finding must state the amount of support that would have been required under the guidelines, as well as the reasons for the variance. *Id.* However, the Act's statutory guidelines are applicable only where child support is the responsibility of a single parent. *In re Marriage of Steadman*, 283 Ill. App. 3d 703, 709 (1996). In a split custody situation, a trial court is not required to conform to section 505 of the Act and state its reasons for deviating from the guidelines. *Id.* The trial court's determination of child support will not be reversed absent an abuse of discretion. *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 37.

¶ 61    First, Sharyl claims that, since the trial court erred as a matter of law by failing to apply the law as announced in *Reppen-Sonneson*, the standard of review here is *de novo*, and not abuse-of-discretion.

¶ 62    We will not review this issue *de novo*. First, Sharyl cites to no authority for the proposition that an award of child support should be reviewed *de novo*. Second, the rule of law "announced" in *Reppen-Sonneson* makes it clear that the trial court can use its discretion in choosing how to determine child support when custody of the child(ren) is shared. See *Reppen-Sonneson*, 299 Ill. App. 3d at 695 ("When custody is shared, the court may apportion the percentage between the parents (*In re Marriage of Duerr*, 250 Ill. App. 3d [232,] 238 [(1993)]), or may disregard the statutory guidelines in the Act and instead consider the factors listed in section 505(a)(2) (*In re Marriage of Steadman*, 283 Ill. App. 3d 703, 708-09 (1996))."). Accordingly, we will review the trial court's child-support decision under the abuse-of-discretion standard.

¶ 63    Sharyl argues that the trial court did not use either method that *Reppen-Sonneson* set out to determine child support. Instead, she argues, in its June 15, 2010, order, it created another method of calculating child support, by equalizing the parties' incomes. She also claims that, since *Reppen-Sonneson* directs that one of the options available to the trial court is to consider the factors under section 505(a)(2) of the Act, the trial court should have stated what amount would have been awarded under the guidelines and the reasons for the variance from the guidelines.

¶ 64    There are several problems with Sharyl's arguments. First, our focus is not on how the trial court allocated child support in its June 15, 2010, order, because it is clear from the record that the court granted in part Sharyl's motion to vacate, modify, or reconsider several

-12-

of its decisions, one of which was the allocation of child support. It is also clear from the record that, when the court reconsidered its order and reduced Sharyl's child support obligation from $805 per month to $711.20 per month, it was doing so based upon: (1) the uncontroverted evidence of *her net income*; and (2) the fact that $711.20 represented 20% of that income. Strangely, Sharyl's reference to the "equilibrium" method of calculation that the trial court applied in its June 15, 2010, order belies the issue as stated in her brief–that the trial court erred in awarding "guideline child support to Lloyd."

¶ 65    Second, we disagree with Sharyl's claim that the trial court was obligated to state the amount of support that would have been proper under the statutory guidelines as well as the reasons for the variance from those guidelines. Such requirements do not exist in a case where the parents share custody of the child. See *Steadman*, 283 Ill. App. 3d at 709.

¶ 66    Although we disagree with Sharyl's specific claims, we do agree with her that the trial court abused its discretion in awarding Lloyd child support equal to 20% of her net monthly income. As we have noted, it is clear from the record of the hearing on Sharyl's motion to reconsider that the trial court was awarding 20% of Sharyl's net income to Lloyd. Since the parties share custody of Alyssa, the trial court had two options in determining child support: (1) apportion the percentage between the parties; or (2) consider the factors in section 505(a)(2) of the Act and award an alternative figure. See *Reppen-Sonneson*, 299 Ill. App. 3d at 695. Although the court was not obligated to state its reasons for such a variance, a review of the record makes it clear that it did not review the factors in 505(a)(2) of the Act but instead simply awarded Lloyd the statutory guideline amount of 20% of Sharyl's net monthly income. Such a determination ignored recognized principles of law and was therefore an abuse of discretion. Accordingly, the trial court's order granting Lloyd $711.20 in monthly child support is reversed, and this issue is remanded for a proper determination of child support.

¶ 67                                   2. Sharyl's 401(k)

¶ 68    Finally, Sharyl argues that the trial court abused its discretion in distributing her 40l(k) equally between the parties in the May 23, 2011, order without reevaluating the property distribution that the court had awarded on June 15, 2010. Sharyl also claims that since the 40l(k) was in her name alone, it should have been awarded solely to her.

¶ 69    Section 503(a) of the Act defines " 'marital property' " as "all property acquired by either spouse subsequent to the marriage," except for enumerated exceptions. 750 ILCS 5/503(a) (West 2010). Retirement benefits earned during marriage are considered marital property. *In re Marriage of Parker*, 252 Ill. App. 3d 1015, 1021 (1993).

¶ 70    Section 503(d) of the Act (750 ILCS 5/503(d) (West 2010)) requires the trial court to divide marital property in "just proportions," considering the 12 relevant factors set forth therein. Those statutory factors include:

"(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including *** the contribution of a spouse as a homemaker or to the family unit;

(2) the dissipation by each party of the marital or non-marital property;

-13-

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any antenuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d)(1) to (d)(12) (West 2010).

¶ 71    The test of proper apportionment is whether it is equitable, and each case rests on its own facts. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121. An equitable division does not necessarily mean an equal division, and a spouse may be awarded a larger share of the assets if the relevant factors warrant such a result. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 175 (2000). A reviewing court applies the manifest-weight-of-the-evidence standard to the trial court's factual findings on each factor, but it applies the abuse-of-discretion standard in reviewing the trial court's final property disposition. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005).

¶ 72    We initially note that Sharyl is incorrect that since her 401(k) is in her name only it should have been awarded solely to her. Here, the income in Sharyl's 401(k) was earned during her marriage to Lloyd and as such is marital property. *Parker*, 252 Ill. App. 3d at 1021.

¶ 73    We also disagree with Sharyl that the trial court erred in distributing her 401(k) without reevaluating the original property distribution. Sharyl cites no authority for the proposition that since the trial court failed to distribute the 401(k) in its original judgment it was forced to reevaluate its prior distribution of marital property when it ruled on Lloyd's motion to reconsider. In fact, in the page and a half of text that Sharyl devotes to this issue, she cites to no Illinois statute or case law regarding the division of marital property in dissolution proceedings except to one case that refers to the standard of review. Without sufficient citation to authority we will not entertain this argument. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (parties to an appeal must support their argument with citation to authority when they submit their briefs).

¶ 74    With regard to the specific division of Sharyl's 401(k), our review of the record indicates that the trial court abused its discretion. The record reflects that when ruling on the division of the 401(k) the trial court made the following comment:

"But nevertheless, with regard to any and all pensions, or of the like, a portion earned

-14-

during the marriage should be divided half to each side, and I don't see a reason to deviate with the other findings of the court ***."

¶ 75 These comments indicate to us that the trial court did not review the relevant factors under section 503(d) of the Act to divide the 40l(k) in just proportions as required under the Act. 750 ILCS 5/503(d) (West 2010). Instead, the trial court found that any income in the 401(k) earned during the marriage should be divided half to each side as a matter of course. In failing to exercise its discretion when dividing the 401(k) the trial court abused its discretion. See 750 ILCS 5/503(d) (West 2010) (trial court is required to divide marital property in "just proportions," considering the 12 relevant factors set forth therein); *Romano*, 2012 IL App (2d) 091339, ¶ 121 (the test of proper apportionment is whether it is equitable, and each case rests on its own facts).

¶ 76 Here, an equal distribution of Sharyl's 401(k) might be deemed equitable after an evaluation of all the relevant factors in section 503(d) of the Act. However, it is clear that the portion of the trial court's May 23, 2011, order dividing Sharyl's 401(k) equally between the parties was arbitrary and ignored recognized principles of law. As such, it was an abuse of discretion. *In re Marriage of Daebel*, 404 Ill. App. 3d 473, 486 (2010) (a trial court abuses its discretion when it acts arbitrarily, without conscientious judgment, or in view of all the circumstances exceeds the bounds of reason and ignores recognized principles of law, resulting in substantial injustice). Therefore, we reverse the portion of the trial court's order splitting Sharyl's 40l(k) equally between the parties and we remand for a proper division of this asset pursuant to section 503(d) of the Act. 750 ILCS 5/503(d) (West 2010).

¶ 77                                                                III. CONCLUSION

¶ 78 For the reasons stated, we find that the trial court did not abuse its discretion in awarding Lloyd maintenance in the amount of $200 per month for two years. However, the trial court did abuse its discretion in ordering Sharyl to pay child support in the amount of 20% of her net monthly income when the parties share custody of Alyssa and the court failed to either apportion the statutory guideline amount or apply the factors in section 505(a)(2) of the Act. 750 ILCS 5/505(a)(2) (West 2010). Finally, the trial court abused its discretion in dividing Sharyl's 401(k) equally between the parties without considering the relevant factors in section 503(d) of the Act and then dividing the property in just proportions. 750 ILCS 5/503(d) (West 2010).

¶ 79 Accordingly, the judgment of the circuit court of McHenry County is affirmed in part and reversed in part, and the cause is remanded for additional proceedings consistent with this opinion.

¶ 80 Affirmed in part and reversed in part; cause remanded.