NOTICE
Decision filed 08/16/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210055-U

NO. 5-21-0055

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JEFFREY A. KUNSEMILLER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee and | ) | St. Clair County. |
| Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 11-D-65 |
| | ) | |
| BEVERLY A. KUNSEMILLER, | ) | |
| | ) | Honorable |
| Respondent-Appellant and | ) | Stacy L. Campbell, |
| Cross-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The findings of the circuit court of St. Clair County are affirmed where the trial court did not err in vacating its May 23, 2019, order; where the court did not abuse its discretion in calculating the income of the parties, denying an award of nonminor education expenses, denying the respondent's request for additional attorney fees; and did not err in denying an award of sanctions against the respondent.

¶ 2    This is an appeal from the circuit court of St. Clair County establishing maintenance and support due to a change in circumstances of the parties, Jeffrey and

1

Beverly Kunsemiller, who were divorced in 2014. The parties share three children, one of which is still a minor. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The petitioner and cross-appellant, Jeffrey Kunsemiller, filed a petition for dissolution of marriage against the respondent-appellant, Beverly Kunsemiller, on January 5, 2011. A judgment for dissolution of marriage was entered on June 17, 2014. At the time of dissolution, the parties had three minor children ages 13, 11, and 8—the two oldest children are no longer minors. The judgment of dissolution named Beverly as the custodial parent of the children. As to support and maintenance, the trial court noted that, "[t]he manner in which the parties maintained their financial records, and the accounting and tax reporting techniques employed by them, leads to a difficult task before the Court to determine the true incomes of the parties. The evidence introduced by the parties is widely divergent." The court noted on multiple occasions throughout its order that the parties were each living beyond their means and that this was the case prior to the separation. The court noted that Beverly's bankruptcy and the substantial debt held by Jeffrey further demonstrated that they were both in fact living beyond their financial means.

¶ 5     The trial court found that Beverly was in need of permanent maintenance and awarded her $1700 in maintenance per month, modifiable upon a change in circumstance. The court found that, based on the evidence, and making reasonable inferences, Jeffrey's gross monthly income was $13,100 and his net income was $6495 for the purposes of establishing child support and maintenance. The court therefore calculated the statutory

child support to be $2078. The court further found that Jeffrey would continue to provide health insurance for the minor children and would pay 75% of their reasonable and necessary health care expenses. As to the children's schooling, Jeffrey was to pay 75% and Beverly was to pay 25% of the cost of the children's private school tuition for the 2014-15 school year. After the end of that term, either party could give notice that they wished to withdraw support for private schooling, including high school education. Jeffrey was to be responsible for 75% of the costs of extracurricular activities. The court reserved the issue of post-high school education expenses for the children.

¶ 6    On July 3, 2014, Beverly filed a motion for new trial or in the alternative to reconsider. On July 14, 2014, Jeffrey filed a posttrial motion/motion to reconsider. On September 10, 2014, the trial court entered a written order on all posttrial motions. The order adjusted child support to $2350 per month and maintenance was redetermined to be $1875, both payable retroactively to the date of the hearing. The court also made several other findings regarding visitation and holiday rotation.

¶ 7    On September 24, 2014, Beverly filed her notice of appeal. This court affirmed the trial court's determination of Jeffrey's income in calculating income and maintenance and affirmed the retroactivity of the order. See *In re Marriage of Kunsemiller*, 2015 IL App (5th) 140485-U.

¶ 8    On June 2, 2016, Beverly filed a motion to modify child support and maintenance. As to child support, she argued there was a substantial change in circumstances where the children were older and therefore had increased expenses, where the parties' eldest child had expenses related to her driving, and where Jeffrey's income had substantially

3

increased. As to maintenance, she argued that a substantial change in circumstances occurred justifying a modification where Beverly had continued to work but could not increase her earnings and where Jeffrey's earnings substantially increased. On August 5, 2016, Jeffrey filed a cross-motion to modify child support and maintenance arguing that his net income had substantially decreased and that Beverly's income had substantially increased. On August 19, 2016, Beverly filed her response to Jeffrey's motion to modify support and maintenance. On April 10, 2018, Beverly filed a petition for nonminor support.

¶ 9    On May 23, 2019, the trial court entered a written order on the parties' cross-motions to modify support and maintenance as well as Beverly's motion for nonminor support. The court awarded $4551 per month in maintenance to Beverly and child support was modified to $1691 to be reduced to $1130 upon their middle daughter's emancipation. Beverly's motion to modify was granted, retroactive to July 1, 2016, which resulted in an arrearage of $81,813 owed by Jeffrey. The court also required that Jeffrey make Beverly the beneficiary on his life insurance policy of up to $500,000 of said policy, as long as he had a support obligation, and denied Beverly's request for attorney fees and costs.

¶ 10   On June 20, 2019, Leah Captain filed a notice of appearance on Jeffrey's behalf. Jeffrey also filed a motion to set aside/vacate the trial court's May 23, 2019, order. The motion alleged that at the May 23, 2019, hearing Jeffrey was represented by Jamie Mitchell. Jeffrey arrived at the courthouse that day at 8:30 a.m., as instructed by his counsel. He then waited in the hallway for his attorney to arrive so that he and his

accountant could appear at the hearing. Jeffrey's counsel failed to speak to him or the accountant until after the hearing had concluded, despite Jeffrey being prepared to present evidence regarding the motions, including testimony regarding the income of the parties. Jeffrey, therefore, was not afforded the opportunity to present evidence and instead remained in the hallway for the entirety of the proceeding. Jeffrey did not receive a copy of the court's order until he personally obtained one from the courthouse on June 14, 2019. He did not consent to the matters contained in the judgment, nor did he agree to waive testimony on pending issues. Because of these events, he experienced great prejudice and requested that the court set aside the May 23, 2019, order. On July 9, 2019, Beverly filed her response to Jeffrey's motion. On August 7, 2019, the trial court entered a written order granting Jeffrey's motion to set aside/vacate the order of May 23, 2019, pursuant to the Code of Civil Procedure (Code) (735 ILCS 5/2-1203 (West 2018)).

¶ 11 On September 20, 2019, the trial court entered a written order granting Beverly interim attorney fees where "[t]he parties' updated [f]inancial [a]ffidavits show a disparity in income sufficient to justify an award of interim fees to [Beverly's] attorney." The court set the interim fees at $6900. On September 30, 2019, the court entered a written order stating that all expert witnesses disclosed prior to March 15, 2019, were allowed to testify and that all supplemental reports were due by October 30, 2019.

¶ 12 On November 14, 2019, the trial court held a hearing on all remaining matters. Jeffrey testified that he lived in Shiloh and was self-employed as an orthodontist. He completed his orthodontic training in 2004. He and Beverly had been married since 1992. His orthodontia practice was open four days a week and closed on Wednesdays

5

and the weekends. He admitted that the transaction list by vendor was potentially inaccurate as to the dates of transactions because two of his business lunches were dated on Saturdays, and he typically did not take his staff to lunch on non-workdays. He also admitted that he sometimes used his business account to pay for meals with his children.

¶ 13    Jeffrey used his business account to pay his student loan every month, his health insurance for he and his three children, his Amazon Prime subscription, vehicle maintenance and two car payments, $1500 in cash withdrawals for employee Christmas bonuses, the attorney fees he was ordered to pay on Beverly's behalf, his own attorney fees, Charter telephone and internet service, payments on his business loan, his telephone system through CompuType, purchases of computer equipment, his practice management software, his IRA account, a rental car for his daughter while her vehicle was being repaired, his eldest daughter's student loans, Hulu, his home water bill, his personal taxes, his liability insurance, his malpractice insurance, a new refrigerator for the office from Lowe's as well as other unknown charges at Lowe's, Netflix, PayPal expenses for purchasing diamond burs, alcohol purchases, SiriusXM, his cell phone, payments to his accountant, TopGolf, his Transworld Recovery collections account, and his rent, the last of which was not reflected in the ledger.

¶ 14    Jeffrey clarified that all of the personal expenses that were paid out of the business account were paid that way because the funds were not available in his personal account. For tax purposes, he would pay the bills out of his business account and then at the end of the year they would get added as income to his personal tax return. He admitted that there were certain line items missing from the ledger that he had deleted where he was

sure it had been taxed on his personal income. Therefore, the court stopped the hearing because of the potential discovery issue.

¶ 15   On January 8, 2020, the hearing resumed. The trial court began by explaining that the trial had started on November 14, 2019, but was stopped because it was brought to the court's attention that there were potential discovery issues of things that had not been turned over by Jeffrey to Beverly. Since everything had currently been turned over, the trial continued.

¶ 16   Jeffrey testified that he deposited client payments into his Catholic Community business account and then logged the paper deposit slips into his QuickBooks. He also noted credit card payments in his QuickBooks. Both he and his accountant had access to the QuickBooks. All payments received by the business were recorded through the Dolphin software. He reiterated that sometimes his rent for his residence was paid from the business account. Additionally, he did not keep track of which cash from the business was deposited into the business account and what cash he took home. The "mobile deposits" that appeared on his bank statement were checks he wrote from the business to himself and then deposited from QuickBooks into his personal account to cover expenses. He also deposited some of the business's checks that were made out to him directly to his personal account. He received his salary through direct deposit. His only income starting in January 2016 was his orthodontia practice. He admitted that, from June 2016 through December 2019, he changed his W-2 income received from the practice each year. Also, his 2018 officer compensation was $116,950, which was down from $132,100 in 2016. He explained that the reason he had started to pay himself less

7

through salary was to have additional income available in the business account to cover expenses. He admitted that all three attorney fees entries, where he paid either his lawyer or Beverly's pursuant to court order, were listed as legal expenses in QuickBooks, though all the fees were related to the divorce proceedings and not the business. For the expenses related to the business, he paid rent, staff, equipment, and insurance. He had recently cashed out his IRA to pay legal fees and a past due Invisalign bill. He had his business up and running at the end of 2010. Prior to that, he was employed as an orthodontist by dentists' offices.

¶ 17  Jeffrey testified that, in the 2018-19 school year, he took out a parent PLUS loan for his oldest child and was currently making those payments out of the business account. He had applied for a parent PLUS loan for the current school year but was rejected. He had also attempted to get private loans but was denied due to his credit history. Also, his payments were not current on his own student loans. He had not seen his daughter's grades and had not spoken to her about school because she did not speak to him. He noted that she attended an expensive school, and he did not have the financial capability to pay one-half of her tuition. His business was having problems, but he had not sought alternate employment because he was committed to the business. It was his estimation that in 2019 his income was $150,000.

¶ 18  On cross-examination, Jeffrey testified that he relied on his accountant for both his personal and business tax returns. He noted that he had gone over Beverly's accountant, Susan Young's, report in this case and notated some business expenses she had classified as personal. Specifically, there were meals that were classified as personal by Young that

8

he contended were business expenses because he took his staff out for a Christmas dinner, birthday lunch, etc. He stated that he deferred to his accountant in categorizing expenses when it came to taxes, vehicle expenses, health insurance expenses, and those expenses about which he was unsure whether they were a business deduction or not. Lastly, he testified that the cash he removed from his business account was for Christmas bonuses.

¶ 19 Beverly testified that she lived in the previous marital residence that was now owned by her brother. She and the children had continued to reside in that home since the divorce. Based on her maintenance and her child support, she received $1950 every other week. She owned a hair salon and was employed as a hairdresser. While Jeffrey was in school, she was employed full time as a hairdresser at Nirvana, the salon that she now owned. Prior to getting pregnant with their second child, she was working upwards of 70 hours per week.

¶ 20 Beverly testified that they had three children, ages 19, 18, and 14. The 19-year-old was away at school in Georgia. Their middle child had just been accepted to Arizona State University. Beverly was diagnosed with multiple sclerosis in 2017. As a result of her diagnosis, she had flu-like symptoms, blurred vision, migraines, sweats, joint achiness, fatigue, and swelling. It also affected her memory. Though she worked full time while Jeffrey was in dental school, she did not work full time while he was in orthodontics school after she had their second child. At present, she was not able to work five days a week. Currently, on Mondays, she went to the bank, managed orders, etc.; on Tuesdays, she did hair but she then had to skip a day as she could not work two days in a

row. She could only work a half-day on Fridays as that was when she received her shot for her treatment. She could not work on Saturdays because of the flu-like side effects from the shot. She purchased the business in 2010 and had been running it ever since. She had no employees but made money from the hairstylists at her business who were paying her rent. She did not use QuickBooks for her record keeping. Instead, she used an appointment book, a sheet of product sales, and a ledger. She used her bank statements for completing the ledger. The bank statements had a mix of business and personal expenses. She admitted to categorizing her petty cash as an expense. She also stated that the loan payments in her ledger were payments to her father for money he had loaned her to run her business. However, her father passed away in November 2018; therefore, from December 2018 to the present the only income she received was from either rent payments or product sales.

¶ 21 Beverly had categories for health insurance, maintenance and repairs, rent on her business, utilities, automobile, meals, and draws. She testified that those expenses listed as charity and party décor were personal expenses and that she also had to pay dues for her license, corporation taxes on her business, insurance, office supplies, products, and postage and shipping. Though she was unable to stay current with her rent consistently between 2018 and 2019, she was currently up to date. Her accountant was Kerber, Eck & Braeckel (KEB), and they prepared her tax returns in 2016 and 2017. She provided all her bank statements and ledgers to them for tax preparation purposes. She provided support to her eldest daughter through Venmo to pay for art supplies and other expenses. She normally prepared ledgers per quarter for her accountant. She also paid her oldest

daughter's monthly interest payments to Sally Mae on her daughter's school loan from her business account. She stated that financially, she assisted her daughter with "whatever she needs."

¶ 22 Beverly testified that she currently paid rent of $2600, which was current as she made that payment in two installments through her child support. She also paid for her internet and her telephone bill, which included her cell phone, through her business. The business also paid for her car payment, licensing, city stickers, and gasoline. She was no longer insured on the vehicle, and she no longer had health insurance. The date of her last treatment was the previous month, but she was no longer receiving her shots as the cost was $6000 without insurance. She could not afford insurance payments of $600 per month. The business was also currently paying for her YMCA membership, entertainment, dining out, hobbies, professional dues, licensing, and taxes. At the time the petition to modify was filed, all three children were living with her; however, at the end of the school year only one child would still be a minor. The oldest child stayed with her when the child came home to visit from college. She also paid for the children's clothing expenses, grooming expenses, tuition, book fees, school lunches, transportation, school sponsored trips and events, dance lessons, gas, presents for their friends, housing, Amtrak, and hotel and car rental for the start and end of the eldest child's school year.

¶ 23 Beverly contended that, based on her present physical condition, she could not support herself by only doing hair. At a maximum, she was capable of standing two days per week and had not worked more than two days a week at any time in the last 12 months. She earned a high school diploma and was licensed to cut hair. Since

11

graduating high school, her only employment history was being a hairdresser. When she was able to work full time, her best earnings year was $30,000, but she did not own the business at that time and could work 70 hours per week.

¶ 24   On cross-examination, Beverly testified that she reported no income on her 2016 tax return other than her maintenance as she did not take any money from the business. In 2016, her corporate tax returns showed the corporation's total income to be $131,141. She also admitted that her claimed bank fees were more than what she received in maintenance. She occasionally paid her personal utility bills out of her business account. She did not take an income in 2017. Her business paid for her personal health insurance. In 2017, her bank fees dropped to $3949, roughly $24,000 less than the previous year. The business also paid commissions and license fees. She did not receive an income from her business in 2018. She noted that her testimony regarding expenses in 2018 would be roughly the same as the previous two years.

¶ 25   Beverly had a written lease with her brother and her monthly rent was $2500. She admitted that the house she was living in was larger than Jeffrey's but explained that this was because she had four people living with her full time. She had a Honda Pilot that was leased through her business, which also covered insurance, repairs, and maintenance. She had some dental and optical expenses. As for the children, the business paid her oldest daughter's yearly housing costs. She admitted that the debts owed to her father through November 20, 2012, were discharged in bankruptcy court. It was her testimony that she took additional loans out with her father after the bankruptcy proceedings. She

admitted she had a monthly gross income of $2594 per month in addition to her support and maintenance.

¶ 26    Beverly previously had nine independent contractors working for her at Nirvana, at the present she had three independent contractors. The salon was open six days a week, Monday through Saturday. She did not have written contracts with the three contractors, she issued them 1099s, and they paid her rent. She admitted that there was one shared appointment book that was destroyed each month because it contained personal information such as client phone numbers. She did not keep records of how much rent she received, and she only kept her deposit slips for one month. The rent checks included the cost of fees for the chemicals used by the stylists. She admitted that she destroyed records after the date a request for production was sent to her counsel via Jeffrey's counsel in the current matter. She admitted that her previous bank closed her business account because she was using it like a personal checking account.

¶ 27    Jeffrey again testified that he rented his home for $1571 per month. He also paid student loan payments, life insurance, electric, renter's insurance, internet, garbage removal, pet care, groceries and household supplies, and Pass Security, for a total of $2642 in total monthly household expenses. His transportation expenses totaled $480 a month. His personal expenses included doctor's visits, medication, and clothing totaling $570 per month. He also testified about the expenses he paid for the children including clothing; books, fees, and supplies; lunches; transportation; doctor's visits; optical; medication; extracurricular activities; summer school and camps; and entertainment. His

13

total monthly living expenses were $5100. He also owed multiple debts, including a parent PLUS loan for his eldest daughter.

¶ 28    On November 4, 2020, Jeffrey filed a motion for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) and Illinois Supreme Court Rule 219 (eff. July 1, 2002). On November 4, 2020, the parties filed written closing arguments.

¶ 29    On December 9, 2020, the trial court entered a written order on the cross-motions to modify maintenance and child support and found that neither party was credible as to their income. The court also found that it was "clear that [Beverly] destroyed records during the pendency of this litigation." The court therefore utilized the reports and evidence deposition of Young in determining the parties' incomes. The court found a substantial increase in both parties' incomes. However, it was also clear that Beverly's income had been decreasing from 2016-18. The parties' children were also substantially older as two had become adults before the entry of the order. Overall, the court found a substantial change in circumstances had occurred justifying a modification of child support and maintenance. The court awarded Beverly $3266 per month in maintenance, which would be retroactive from July 2016, amounting to an arrearage of $73,723. As to child support, the court found that child support overpayment credits totaled $24,082; therefore, Jeffrey owed an arrearage of $49,641. The court denied Beverly's petition for nonminor support where no evidence of the child's financial resources or academic performance were presented at trial. Beverly's request for attorney fees was also denied.

¶ 30    On January 5, 2021, Beverly filed a motion to reconsider, and, on January 7, 2021, Jeffrey filed a motion for clarification and reconsideration. On February 3, 2021, the trial

court entered a written order denying the parties' cross-motions for reconsideration. Beverly appeals, and Jeffrey cross-appeals.

¶ 31                                    II. ANALYSIS

¶ 32    There are five issues on appeal: (1) whether the trial court erred in vacating its May 23, 2019, order; (2) whether the court erred in its calculation of the self-employment incomes of the parties; (3) whether the court erred in failing to award nonminor education expenses to Beverly; (4) whether the court erred in not awarding Beverly additional attorney fees; and (5) whether the court erred in not awarding Jeffrey sanctions.

¶ 33    As to the first contention, section 2-1203(a) of the Code permits a party to move to vacate a civil judgment 30 days after its entry. 735 ILCS 5/2-1203(a) (West 2018). We review the trial court's granting of a motion to vacate for an abuse of discretion and whether the court's decision did substantial justice between the parties. *In re Marriage of Sutherland*, 251 Ill. App. 3d 411, 414 (1993).

¶ 34    Here, the record indicates that the trial court granted the motion to vacate because Jeffrey was not included in the hearing and did not participate in the hearing despite the fact that he was present at the courthouse in the hallway and intended to present evidence as demonstrated by the presence of his accountant. The cases cited by counsel are distinguishable from the case at bar where Jeffrey was not present in the courtroom, where he did not intend to waive his right to present evidence, and where he did not give his attorney permission to waive said right. This is further evidenced by the fact that the court changed the terms of the May 23 order in entering its subsequent December 9 order.

15

Therefore, we find that the court did not abuse its discretion in vacating its May 23, 2019, order as doing so did substantial justice between the parties.

¶ 35    Next, both parties contend that the trial court erred in determining their incomes for maintenance and child support purposes.  Both parties claim error where the trial court attributed too much income to them and not enough to the other party.  Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a) (West 2018)) authorizes a trial court in dissolution proceedings to award to either spouse maintenance in amounts and for periods of time as the court deems just.  "[C]ourts have wide latitude in considering what factors should be used in determining reasonable needs, and the trial court is not limited to the factors listed in the governing statute."  (Internal quotation marks omitted.)  *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 10. We will not disturb a maintenance award absent an abuse of discretion.  *In re Marriage of Smith*, 2012 IL App (2d) 110522, ¶ 46.  An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court.  *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 32.

¶ 36    Here, the trial court made clear in its order that neither party was credible as to reporting their income.  The court relied on the reports and deposition testimony of Young in making its determination.  Throughout the pendency of this case, there were issues with discovery and the parties either failing to turn over complete documents or in destroying relevant financial documents.  We cannot say that the court's reliance on Young's reports was an abuse of discretion where neither party was forthcoming or credible.  Additionally, as both parties are self-employed, we agree that the court could

16

not rely on the testimony of the parties as to their personal and business expenses because both parties tried to pass off personal expenses as business expenses. Therefore, we will not disturb the court's determination of the parties' income for maintenance and support purposes.

¶ 37 The next argument raised by Beverly is that the trial court erred in not awarding her nonminor education expenses. "Under section 513 of the Act, the court may award educational expenses for adult children for college or professional training." *In re Marriage of Zukausky*, 244 Ill. App. 3d 614, 623 (1993). Under the provisions of the Act, in making its determination, the court considers: (1) the present and future financial resources of both parties to meet their needs, including, but not limited to, savings for retirement; (2) the standard of living the child would have enjoyed had the marriage not been dissolved; (3) the financial resources of the child; and (4) the child's academic performance. 750 ILCS 5/513 (West 2018). The determination of education expenses is within the court's discretion. *In re Support of Pearson*, 111 Ill. 2d 545, 551 (1986).

¶ 38 We agree with the trial court that there was not sufficient evidence presented at trial to justify an award of nonminor support where there was no evidence presented as to the financial resources of their eldest daughter, nor was there any evidence regarding her academic performance.

¶ 39 Next, Beverly contends that the trial court erred in denying her an award of additional attorney fees. Primarily, the obligation for the payment of attorney fees rests on the party on whose behalf services were rendered. *In re Marriage of Mantei*, 222 Ill. App. 3d 933, 941 (1991). However, section 508(a) of the Act allows the court to order a

17

party to contribute a reasonable amount of the opposing party's attorney fees. 750 ILCS 5/508(a) (West 2018).

> "A contribution award is based on the criteria for the division of marital property and where maintenance has been awarded, the criteria for an award of maintenance. 750 ILCS 5/503(j)(2) (West 2010). The criteria include the property awarded to each spouse, their incomes and present and future earning capacities and 'any other factor that the court expressly finds to be just and equitable.' See 750 ILCS 5/503(d), 504(a) (West 2010). The spouse seeking the contribution must establish his or her inability to pay and the other spouse's ability to pay. *Schneider*, 214 Ill. 2d at 174." *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 113.

A court's determination regarding attorney fees will not be disturbed absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13.

¶ 40 Here, the trial court made clear that it was of the opinion that both parties were living beyond their financial means. However, the court did acknowledge the difference in the parties' incomes where it awarded Beverly interim fees. We cannot say that the court vacating the May 23 order, or the subsequent fees incurred thereafter, proves that the court abused its discretion in not awarding Beverly additional attorney fees. Therefore, we will not disturb the decision of the court.

¶ 41 Lastly, on cross-appeal, Jeffrey argues that the trial court erred in not imposing sanctions on Beverly. "Rule 219(c) authorizes a trial court to impose a sanction, including dismissal of the cause of action, upon any party who unreasonably refuses to comply with any provisions of this court's discovery rules or any order entered pursuant to these rules." *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). The decision to impose a particular sanction under Rule 219(c) is within the discretion of the trial court and, therefore, will not be reversed absent a clear abuse of discretion. *Id*.

18

¶ 42    Here, the record establishes, and the trial court found, that it was undisputed that Beverly destroyed relevant financial records during the pendency of the litigation. However, the court did not rely on the parties' testimony or personally prepared documents in making its determination regarding maintenance or support. The court's decision was not affected by the lack of those financial records as it found that neither party was credible. Therefore, we cannot say that its refusal to enter sanctions against Beverly was an abuse of discretion.

¶ 43                              III. CONCLUSION

¶ 44    For the foregoing reasons, the order of the circuit court of St. Clair County for maintenance and support is hereby affirmed.

¶ 45    Affirmed.